JOY COSSICH LOBRANO, Judge.
| jThis case involves a dispute over the ownership of 800 shares of stock in Buff-man, Inc., a family-owned corporation that operated St. Rita’s Nursing Home (“St. Rita’s”) in St. Bernard Parish. Following a trial, the trial court determined plaintiff, Anthony Buffone, had ratified the issuance of the 800 shares of stock to his sister, Mabel Mangano, and rendered a judgment accordingly. Plaintiff appealed. For the reasons that follow, we affirm the district court judgment.
Buffman, Inc., was incorporated and registered with the Louisiana Secretary of *924 State on September 19,1984. The articles of incorporation, which authorized the issuance of 1,000 shares of stock, issued 100 shares each to plaintiff and Salvador Man-gano, Mabel’s husband. The remaining 800 shares were not issued at that time. The Board of Directors and officers of the corporation were listed as Salvador Man-gano (president), Anthony Buffone (vice president), Mabel Mangano (secretary) and Agnes Buffone[1] (treasurer).
On October 2, 1985, a stock certificate evidencing the remaining 800 shares of stock was issued to Mabel Mangano. Although Salvador and Mabel Mangano | ^signed the certifícate as corporation president and secretary, respectively, there are no minutes from a Board of Directors meeting for that date reflecting a vote to issue the stock, nor is there a corporate resolution authorizing the stock issuance.
On October 28, 1985, the Board of Directors held a meeting and passed two resolutions. The first, Resolution 11-85-1-A, appointed Mabel Mangano as the authorized representative of Buffman, Inc., giving her the power to enter into any contracts necessary for the operation of St. Rita’s. The second, Resolution 11-85-2, obligated Buffman, Inc., to repay the mortgage executed by Mabel and Salvador Mangano in the amount of $294,000.00 to construct and operate St. Rita’s pursuant to the terms of the mortgage.[2]
Mabel and Salvador Mangano managed all the business and daily operations of St. Rita’s. Although plaintiff received a regular salary from Buffman, Inc., he had no active role in operating the home.[3] St. Rita’s operated successfully from September 1984 to August 29, 2005, when flooding in the aftermath Hurricane Katrina destroyed the facility, and 35 residents died. After the hurricane, Buffman, Inc., successfully sued its insurer, Lafayette Insurance Company, for property damage and loss of business income.[4] Meanwhile, the Louisiana Attorney General filed criminal charges against Salvador and Mabel Man-gano for the deaths and injuries that occurred as a result of their failure to evacuate the facility prior to the storm, despite government warnings to do so.
| sIn August 2007, prior to the start of the criminal trial, plaintiff spoke with John Reed, one of the Mánganos’ defense attorneys, who informed him that he (plaintiff) owned only ten percent (10%) of Buffman, Inc. According to plaintiff, at that point in time, he believed he still owned fifty percent (50%) of the corporation and was unaware the remaining 800 authorized shares of stock had been issued to Mabel. He claimed he “blew off’ the conversation and did not inquire whether Reed’s information was correct, because he did not want to bother the Mánganos while their criminal trial was pending.[5] However, several days later plaintiff did tell his wife about his conversation with Reed.
In early 2010, Mabel Mangano sent plaintiff a “Cash Call” letter that stated, in part:
Sal and I are writing to inform you that it is necessary to put $100,000.00 into Buffman, Inc, in order to begin renovating the nursing home property *925 so that the State will not revoke our Certificate of Need. Since you are the owner of 10% percent of the stock, your contribution is $10,000.00, which we will need on or before the end of March, 2010.
We anticipate further expenses as time goes on in order to put the property back in shape to serve as a nursing home. Consequently, we expect further cash calls in the near future. Ultimately, the property will again be profitable, but there will be some hard time for all of us before then.
Upon receipt of the letter, plaintiff retained an attorney who sent a letter to Mabel Mangano on May 6, 2010, requesting an inspection of Buffman, Inc.’s records from 1984 to the present. As a result of the inspection, plaintiff discovered that the remaining 800 authorized shares of stock had been issued to Mabel Mangano in |4October 1985. Plaintiff also discovered the Mánganos had used corporate funds to purchase personal items and satisfy personal debts, paid themselves excessive salaries and bonuses, and continued to pay their children and relatives salaries, even though St. Rita’s ceased operations after Hurricane Katrina.
On August 12, 2010, plaintiff filed a Petition for Declaratory Judgment, for Appointment of a Receiver and for Reimbursement, praying for, among other relief, a judgment declaring him the owner of fifty percent (50%) of Buffman, Inc., and the issuance of the 800 shares to Mabel Mangano absolutely null and void.
At a pre-trial hearing, the trial court ruled that the stock issuance was a relative nullity, as defined in La. Civ.Code art. 2031[6]. Thus, the issue at trial was whether or not plaintiff confirmed or ratified the issuance of the 800 shares to Mabel Man-gano.
Following a trial, the trial court found plaintiff acquired notice sufficient to require further action on his part to ascertain the ownership of the 800 shares during his conversation with John Reed in August 2007. From that point on, the court concluded, plaintiff should have known Mabel Mangano claimed ownership of eighty percent (80%) of the corporation. The court found plaintiff’s claim had not prescribed, as it was filed within five years of the date of his conversation with Reed. See La. Civ.Code Art.2032. Referring to La. Civ.Code Art. 1843[7], the |ficourt found no proof that plaintiff expressly ratified the issuance of the 800 shares to Mabel Mangano and, thus, the issue was whether he tacitly ratified it by his inaction. In concluding plaintiff did, in fact, tacitly ratify the stock issuance, the court gave the following reasons:
The cases cited support that tacit ratification can result through the inaction of shareholders when knowledge of the transaction is imputable to them. How *926 ever, the fact that a shareholder chooses not to be involved or take an active role in corporate affairs in and of itself does not impute knowledge to the shareholder. As in any corporation, the owners are the shareholders. The shareholders have no legal obligation to take any action on behalf of the corporation. They can simply sit back and enjoy the fruits of their ownership, i.e. dividends. However, that is not the same for directors and/or officers of the corporation. A director has duties and responsibilities to the corporation while an officer is charged with participation in the day-today operation of the corporation. When a shareholder such as [plaintiff] is also one of the members of the Board of Directors and also the vice-president of the corporation, he stands a greater potential to have knowledge of actions taken by other Board members imputed to him. In fact, [plaintiff] received a salary as an officer in Buffman, Inc.[,] and for twenty-five years regularly went to St. Rita’s. He had unlimited access to all corporate and financial records of Buff-man, Inc. He was fully aware of the construction and improvements made over the years by Mabel Mangano to St. Rita’s. Despite the numerous requests by his wife to check up on the financials of the corporation, he chose to “leave it alone.” In this instance, [plaintiff] chose to allow Mabel Mangano to run the entire operation in exchange for his salary and not having to perform any duties or put any more money into this corporation. It is unreasonable to draw a salary for twenty-five years without any duties and allow another director to run the corporation and then to complain that |fithat person is actually the majority owner of the corporation. The Court finds that to be a tacit ratification by [plaintiff] due to his indifference, his lack of due diligence and his desire to just “leave it alone.” Accordingly, the Court finds that there has been confirmation of the issuance of 800 shares of stock to Mabel Mangano through the “tacit ratification” of the stock issuance. [Plaintiff] is found to be the owner of 100 shares of Buffman, Inc.[,] stock.
On appeal, plaintiff argues that the trial court erred in determining that he tacitly ratified the stock issuance through his indifference and lack of due diligence, considering he had no knowledge of it. Specifically, plaintiff contends that he had to have actual knowledge of the stock issuance in order to ratify it.
Ratification is the adoption by one person of an act done on his behalf by another without authority. It amounts to a substitute for prior authority. First National Bank of Shreveport v. Crawford, 455 So.2d 1209, 1215 (La.App. 2d Cir.), writ denied, 459 So.2d 538 (La.1984). Ratification occurs when personnel with the authority to bind the corporation acquire knowledge of the unauthorized act and thereafter fail to repudiate it within a reasonable period of time. 3 A’s Towing Co. v. P & A Well Service, Inc., 642 F.2d 756, 758 (5th Cir.1981).
In Ogden v. Culpepper, 474 So.2d 1346 (La.App. 2d Cir.1985), several minority shareholders of a corporation filed suit to invalidate a sale of treasury stock conducted by the corporation’s lone director, Billy Culpepper. Delbert Speights, a minority shareholder who initially proposed the sale, was present at the corporate office when the stock certificate was prepared and issued to John Lohnes, an employee and secretary of the corporation. Several years later, at a shareholders meeting with all shareholders present or represented, Culpepper and Lohnes voted their shares to elect themselves directors of the corporation. While Delbert Speights and his *927 family members (collectively, the minority shareholders) 17voted in opposition, their shares were insufficient to block the election of Culpepper and Lohnes.
The minority shareholders, save Delbert Speights and his wife Ruth, filed suit to invalidate the sale of the shares to Lohnes and to challenge the election of Culpepper and Lohnes as directors. The articles of incorporation and Louisiana statutory law required the Board of Directors to be composed of no less than three persons, and because the board was improperly constituted, the Court found Culpepper lacked authority to set the price and issue the shares. Nonetheless, the Court found Culpepper’s acts were not void, but voidable, and could be ratified by the shareholders. The court concluded that such ratification could be implied through acquiescence. Because several years had elapsed between the date of the sale and the date the minority shareholders filed their suit, and they never complained of the sale, the court found their acquiescence could be implied unless they neither had actual knowledge of the sale nor should have knowledge imputed to them.
The court noted that while the minority shareholders, save Delbert Speights, had no actual knowledge of the sale, the reason for their lack of knowledge was due to their placing complete trust in him. The court found the evidence “left no doubt that [the minority shareholders] placed their faith in Speights to watch out for their interests in the corporation and trusted his judgment.” 474 So.2d at 1352. The court further stated:
A well established principle in corporation law is that where a corporation entrusts an officer or director with management of the corporation’s business, the corporation will not later be heard to deny the authority of the individual to act on behalf of the corporation. See City Sav. Bank and Trust Co. v. Shreveport Brick Co., Inc., 172 La. 471, 134 So. 397. See also Harris v. H.C. Talton Wholesale Grocery Co., Inc., 11 La.App. 331, 123 So. 480. Similarly, we hold that in a closely held corporation where an individual controls a significant portion of the shares of the corporation, takes an active role in the managing of the corporation’s business, and is entrusted by related stockholders to watch out for and to act in their best interests, that individual knowledge of corporation’s business affairs may be imputed to those who have entrusted him to act on their behalf.
Id. The court concluded that Delbert Speights’ actual knowledge of the stock sale was imputed to the minority shareholders, and because of such knowledge, the minority shareholders ratified the sale by acquiescence. Id.
In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a trial court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Hall v. Folger Coffee Company, 2003-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98 (citation omitted). Thus, the reviewing court may not merely decide if it would have found the facts of the case differently. Id. The reviewing court should affirm the trial court where the trial court judgment is not clearly wrong or manifestly erroneous. Id.
In the instant case, plaintiff was an officer and director as well as a shareholder in Buffman, Inc. As an officer and director, plaintiff owed a fiduciary duty to the corporation and its shareholders, and was obligated to discharge the duties of his position in good faith, and with the diligence, care, judgment, and skill that an ordinary *928 prudent man would exercise under similar circumstances in a like position. See La. R.S. 12:91(A). Further, as an officer he was obligated to perform the duties in the management of the property and affairs of the corporation as prescribed in the bylaws or by the board. See La. R.S. 12:82(D).
|9Based on the record, and applying the reasoning in Culpepper, supra, we find no manifest error in the trial court’s finding that plaintiff tacitly ratified the stock issuance to Mabel Mangano due to his indifference, lack of due diligence and desire to ignore his duties as an officer and director. Plaintiff acknowledged that he received a regular salary from Buffman, Inc., for twenty-five years, even though he performed no duties at the nursing home. He went to St. Rita’s regularly to pick up his check and had complete access to the corporation’s books and financial statements, yet he choose not to inspect them, despite his wife’s pleas to do so. He allowed Mabel Mangano to manage St. Rita’s daily operations and business affairs. Plaintiff also permitted the Manga-nos to make extensive, costly capital improvements to the facility over the years without objection. Considering plaintiffs position as an officer and director in Buff-man, Inc., we agree with the trial court that it was unreasonable for him to draw a salary for many years without commensurate duties and allow Mabel Mangano to run the corporation, and then to complain that she was the actual majority owner.
Finally, we find it was unreasonable for plaintiff, after being advised in 2007 that he owned only 10% percent of the corporation, to wait three years before filing his suit to challenge Mabel Mangano’s ownership of the 800 shares. At the time, plaintiff knew there had never been a vote at a Board of Directors meeting or corporate resolution authorizing the issuance of the 800 shares. Given that fact, as an officer and director, plaintiff had a duty to ascertain whether the information was correct by either confronting the Mánganos or inspecting the corporation’s books. Plaintiffs failure to take any action within a reasonable period of time after his conversation with Reed to ascertain the actual ownership of the corporation |insupports the trial court’s conclusion that he tacitly ratified the issuance of the shares to his sister.
Accordingly, for the above reasons, we affirm the trial court’s December 20, 2011 judgment in favor of Mabel Mangano, Salvador Mangano and Buffman, Inc.
AFFIRMED
BELSOME, J., concurs in the result.

. Agnes Buffone is plaintiff’s wife.

. The Mánganos’ home served as collateral for the loan.

. Plaintiff's primary occupation was working as a commercial fisherman.

. See Buffman, Inc. v. Lafayette Insurance Company, 2009-0870 (La.App. 4 Cir. 4/14/10), 36 So.3d 1004; writ granted in part, 2010-1341 (La.1/20/12), 78 So.3d 130.

. On September 7, 2007, the jury acquitted the Mánganos of the charges.

. La. Civ.Code. Art.2031 provides:
A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made. A contract that is only relatively null may be confirmed.
Relative nullity may be invoked only by those persons for whose interest the ground for nullity was established, and may not be declared by the court on its own motion.

. La. Civ.Code Art. 1843 provides:
Ratification is a declaration whereby a person gives his consent to an obligation incurred on his behalf by another without authority.
An express act of ratification must be evidence the intention to be bound by the ratified obligation.
Tacit ratification results when a person, with knowledge of an obligation incurred on his behalf by another, accepts the benefit of that obligation.